*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CS, Minor.

UNPUBLISHED
February 15, 2024

No. 367521
Shiawassee Circuit Court
Family Division
LC No. 23-014594-NA

Before: LETICA, P.J., and CAVANAGH and SWARTZLE, JJ.

PER CURIAM.

Respondent appeals by right the order terminating his parental rights to the minor child, CS, under MCL 712A.19b(3)(b)(*i*) (parent's act caused physical injury or physical or sexual abuse to child or sibling) and MCL 712A.19b(3)(k)(*iii*) (parent abused child or sibling and abuse included battering, torture, or other severe physical abuse). We affirm.

## I. BACKGROUND

Respondent is CS's biological and legal father.[1] CS's mother, who was not a respondent in these proceedings, had another minor child, SF. Respondent had a history of committing domestic violence against the children's mother. One incident involved respondent grabbing her throat and squeezing "[n]ot too hard[,] but enough against the wall." Respondent also attempted

---

[1] CS was born in 2011. Respondent moved to Alabama and on to a new relationship. CS's mother followed, moved to Texas, and returned to Michigan in 2016. While in Alabama, Children's Protective Services (CPS) was involved with respondent's new family. In 2020, respondent returned to Michigan to be with the children's mother and they married in 2021. The children's mother subsequently described respondent's alcohol consumption becoming a problem, resulting in his anger and violence escalating.

Respondent also had three older children, who were raised by respondent's parents since 2009. Respondent's mother advised that respondent asked them to care for the children due to his heroin addiction after his partner "disappeared." While respondent's older children were in his parents' custody, he rarely saw them. Respondent's mother opined that respondent had undergone a conversion after his assault on SF.

to "hog-tie" her with "ratchet straps," with the intention to leave her bound overnight. During this incident, the children came downstairs and were screaming. On another occasion, respondent grabbed the children's mother during a verbal argument and "put [her] down" on top a cat cage, leading to her breaking his ribs in an attempt to escape.

Respondent also struck the children with a belt as a form of punishment. Indeed, respondent would offer the children the opportunity to eliminate or reduce a punishment, such as losing access to their electronic device, by opting for a spanking with the belt. The evidence further showed that respondent left marks on SF's body on multiple occasions after using the belt. The record did not unambiguously reveal that CS sustained any similar injuries from the belt. It did, however, confirm that both children reported that respondent struck CS with a belt. It also showed that the children's mother sometimes needed to intercede in respondent's verbally aggressive interactions with CS, who was crying.

In early November 2022, an argument between respondent and the children's mother was followed by what respondent perceived as defiance or disrespect from SF. In turn, respondent beat SF. More specifically, respondent repeatedly struck SF's head, pulled her hair, held her down, and impeded her ability to breathe.[2] SF sustained visible injuries, including numerous marks and bilateral subconjunctival hemorrhages in her eyes. SF's injuries were regarded as potentially life-threatening, and CS was present and witnessed the abuse.[3] Yet, SF did not receive medical attention until four or five days later. In fact, SF's injuries only came to light after church members noticed the heavy makeup that had been applied to SF's face to conceal them. And, although the children's mother had urged SF to lie about the source of her injuries, the church pastor, a mandatory reporter, eventually learned what had happened and contacted the police. Respondent never disputed his actions;[4] however, he later engaged in various services and expressed regret.

Respondent was charged criminally for his attack on SF. He pled guilty to third-degree child abuse, MCL 750.136b(5), and was awaiting sentencing at the time of the best-interests hearing.

In this abuse and neglect matter, respondent entered a plea of no contest to the court's jurisdiction and the statutory grounds for termination of his parental rights. The matter then proceeded with a best-interests hearing before the trial court regarding CS. CS was eleven at that time and had special needs due to various diagnoses, including autism and Attention-Deficit/Hyperactivity Disorder (ADHD).

At the hearing, the church pastor expressed his belief that respondent's actions were reprehensible. Nevertheless, because the pastor was unaware that this was anything other than a one-time event with SF and believed respondent's earlier violence toward the children's mother

---

[2] Review of the file reflects that the children's mother and SF minimized SF's injuries to a medical professional, who reported that the injuries resulted from attempted strangulation.

[3] The file reflects that CS later told SF that "he thought [respondent] was going to kill her."

[4] The file reflects that respondent initially minimized the assault and told his mother that SF suffered "[l]ight bruising on her face."

was materially distinct, he opined that termination of respondent's parental rights was excessive. The church pastor, respondent's mother, and the children's mother, all expressed their opinion that respondent had a positive impact on CS's functioning. Regardless, CS's mother also recognized that CS had "issues" being addressed in "counseling and therapy" for the events he had witnessed.

At the hearing, respondent testified that he "lost [his] temper" with SF. Respondent admitted that he had also lost his temper with CS. Nevertheless, respondent described his assault upon SF as resulting from the difference between a child who accepts that they had done wrong and a child (like SF) "who remains defiant," "belligerent," and "[e]xtraordinarily verbally aggressive."

At the conclusion of the hearing, the lawyer-guardian ad litem (LGAL) argued that termination would not be in CS's best interests if respondent could "get his life straightened around" despite respondent's "terrible decisions." The trial court expressed its belief that respondent had engaged in services long after his need to do so should have been apparent and that he had not really addressed his problems. Moreover, the trial court expressed doubt that the children's mother would be willing or able to protect CS if respondent were to return to the home and reoffend.[5] The court concluded that even if there was no evidence that respondent specifically abused CS, respondent's pattern of violence toward other family members demonstrated that CS would be harmed by respondent modeling abusive behavior and that termination was in CS's best interests.

## II. STANDARD OF REVIEW AND PRINCIPLES OF LAW

A trial court may terminate a parent's parental rights if the court finds that at least one statutory ground for termination was proven by clear and convincing evidence and that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). In contrast to the quantum of proof required to establish a statutory ground for termination, the best interests of the child need only "be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). "This Court reviews for clear error a trial court's determination that petitioner has proved by a preponderance of the evidence that termination of parental rights was in the child's best interests." *In re MJC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 365616); slip op at 9. Under the clearly erroneous standard, a trial court's decision must be "more than just maybe or probably wrong." *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009). Rather, "[a] finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Sanborn*, 337 Mich App 252, 272-273; 976 NW2d 44 (2021) (quotation marks and citation omitted). "In the final analysis, the weight to be accorded one bit of evidence or another is inextricably intertwined with assessments concerning the credibility of the witnesses," and the trial court is "best situated to make that determination." *In re Miller*, 433 Mich 331, 344; 445 NW2d 161 (1989).

---

[5] The children's mother had filed for divorce; however, if respondent's rights were not terminated, she testified that she would "like to stick by" respondent.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *Olive/Metts*, 297 Mich App at 40. The focus of the best-interests analysis is on the child's rights and interests, not the parent's rights and interests. *In re Moss*, 301 Mich App at 87-88. At this stage, "the parent has been found unfit, [so] the focus shifts to the child and the issue is whether parental rights *should* be terminated, not whether they *can* be terminated." *Id.* at 89 (emphasis in original). The child's best interests depend on a multitude of factors, including the child's bond with the parent, the parent's parenting ability, the child's need for permanency, the relative advantages of a foster placement, the child's age, inappropriate parenting techniques, continued involvement in domestic violence, the parent's history of visitation, the parent's own questionable relationships, the parent's compliance with treatment plans, the child's well-being in foster placement, and the possibility of adoption. *In re Sanborn*, 337 Mich App at 276-277. "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Although the trial court must provide a record of its factual findings, those findings need not be more extensive than necessary to permit appellate review. *In re Baham*, 331 Mich App 737, 752-753; 954 NW2d 529 (2020).

## III. ANALYSIS

### A. WITNESS TESTIMONY IN SUPPORT OF PRESERVATION OF PARENTAL RIGHTS

Respondent relies significantly on the contention that all witnesses other than the CPS worker opined that termination was not in CS's best interests. Respondent further asserts that even the LGAL was opposed to termination, and, although not clearly articulated, that the CPS worker had no basis for believing termination was in CS's best interests. These contentions misapprehend the evidence and testimony.

The pastor and the LGAL expressed *conditional* support for preserving respondent's parental rights. The pastor's support was conditioned on his stated belief that respondent's attack on SF was a one-time act of violence and meaningfully distinct from his violence toward the children's mother. In respondent's view, the evidence demonstrated that his violence toward SF never previously rose to the level of being life-threatening.

Notably, the use of unreasonable force in corporal punishment may constitute child abuse, and "there is no legally recognized right to use corporal punishment that leaves marks on a child that last any longer than a *de minimus* period of time." *In re Green*, 512 Mich 533, 552; ___ NW2d ___ (2023). The record evidence demonstrated that respondent did leave marks on SF on multiple occasions. Thus, the pastor's conditional support was unfounded. Likewise, the LGAL's support was conditioned on respondent being capable of effecting meaningful change, which the trial court clearly determined was unlikely in light of respondent's history.

And, to the extent that the children's mother supported preservation of respondent's parental rights, the trial court clearly believed she was being disingenuous and was improperly attempting to shoulder some responsibility for respondent's actions. The trial court's doubt as to her credibility was borne out by the evidence: she instructed SF to hide the evidence of respondent's abuse, she stated that respondent struck SF with a belt only once while SF indicated that respondent did so on multiple occasions, and her testimony about how she reacted to the attack

on SF suggested that she was more concerned about the family's attendance at a funeral the next day than about SF's injuries. Moreover, despite SF suffering serious injuries, the children's mother did not seek professional medical attention for SF until *four or five days after* respondent's assault. The trial court did not clearly err by discounting the children's mother's testimony to the extent that it could be construed as expressing support for preserving respondent's parental rights. See *In re Miller*, 433 Mich at 344. The same is true of respondent's mother's testimony given her minimal opportunities to observe CS.

Respondent further contends that DHHS was on the verge of reunifying the family until the criminal charges were filed, even though "[t]here was literally nothing different about what happened to SF before [respondent] was criminally charged, and after the charges, that would warrant a termination petition being filed." While it is true that the CPS worker agreed that he expected to recommend reunification before the charges were filed, he also testified that the filing of the criminal charges was more than one consideration, out of several, that went into deciding to file the petition. Although the law recognizes that a parent's incarceration alone may not provide grounds for termination, a felony conviction for assault resulting in injury to one's child might be. See *In re Mason*, 486 Mich 142, 165; 782 NW2d 747 (2010). The prospect of respondent facing possible incarceration for felony assault by strangulation[6] against CS's sibling, who respondent ostensibly treated as his own child, cannot be considered as being "literally nothing different." Regardless, to the extent that respondent relies on the assertion that most of the witnesses supported preservation of his parental rights, as already discussed, respondent exaggerates either the nature or the persuasiveness of their testimony. And, in any event, it is elementary that "the weight to be given testimony does not depend upon the number of witnesses that testified[.]" *DeHart v State Bd of Registration in Podiatry*, 97 Mich App 307, 316-317; 293 NW2d 806 (1980).

## B. ANTICIPATORY NEGLECT

Respondent next contends that the trial court improperly applied the doctrine of anticipatory neglect. "The doctrine of anticipatory neglect provides that how a parent treats one child is probative of how that parent may treat other children." *In re Mota*, 334 Mich App 300, 323; 964 NW2d 881 (2020). The doctrine of anticipatory neglect has little probative value if children are situated significantly differently. *In re Kellogg*, 331 Mich App 249, 259-260; 952 NW2d 544 (2020). However, not all differences between children are important, and, as this Court has observed, "abuse is abuse." *In re Mota*, 334 Mich App at 323.

Respondent is correct that there was considerable testimony that SF, his 13-year-old stepdaughter, and CS, his biological 11-year-old son, had very different personalities and needs. Yet, the two children were similarly situated in many relevant ways. As the trial court aptly observed, respondent had a pattern of violence toward his family members, appropriately questioning whether the children's mother would protect CS from respondent if respondent was returned to the home and reoffended. To the extent the children were different in age, sex, familial relationship to respondent, personalities, and needs, the trial court did not clearly err by applying

---

[6] At the time the petition was filed, respondent had only been charged in the criminal matter, and one of the charges was felony assault by strangulation or suffocation, MCL 750.84(1)(b).

the doctrine of anticipatory neglect, especially in light of respondent's own rationale for losing control with SF.

## C. OTHER ARGUMENTS

Respondent also asserts that he and CS had a strong and loving bond. But a child's bond with a parent is only one of many considerations that may be relevant in determining whether termination of parental rights is in the child's best interests. See *In re Sanborn*, 337 Mich App at 276-277. Respondent further notes that there was some evidence that CS's functioning deteriorated after respondent left the home. But there was no evidence linking any such behavioral changes to respondent's departure or ruling out other possibilities, such as the simple fact that there had been a significant change in the household composition. Furthermore, as already discussed, the evidence of the changes in CS's functioning and behavior came from witnesses who had limited opportunities for observation or whom the trial court appropriately deemed unreliable. The evidence did establish that respondent made genuine efforts to support CS's special needs; however, the evidence also indicated that CS was frightened of respondent and sought counseling and therapy for the issues that arose from witnessing respondent's assaults on SF as well as his mother. The trial court emphasized that its focus was on "the next 6 and a half years" and its concern for the long-term consequences to CS rather than the short-term consequences. The court's reasoning does not strike us as unreasonable.

Respondent further suggests that there were alternatives to termination available. In particular, respondent contends that even if the children's mother could not protect CS from respondent, the trial court could have ordered supervised parenting time at a neutral location. However, the trial court was concerned with more than just CS remaining physically safe from respondent; it was also concerned about the long-term effect on CS of being exposed to a parent who modeled the kinds of behavior in which respondent repeatedly engaged. In other words, the trial court believed that CS would be harmed merely by being exposed to respondent, making severance of their relationship the only effective way to permit CS to heal and avoid further harm.

Finally, the law requires the trial court to consider and address a child's placement with a relative, which weighs against termination, in deciding whether termination of a parent's rights is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. Although "[p]lacement with a relative weighs against termination," such placement "is not dispositive." *In re Atchley*, 341 Mich App 332, 347; 990 NW2d 685 (2022). In this case, the trial court recognized that CS and SF were placed with their mother, but it expressed doubt that she could protect them from respondent if he returned to the home. Accordingly, the trial court did not fail to consider and address CS's placement with a relative in concluding that it was in CS's best interests to terminate respondent's parental rights.

Affirmed.

/s/ Anica Letica
/s/ Mark J. Cavanagh
/s/ Brock A. Swartzle

-6-